1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT WAYNE ROGERS,                )     No. C 02-1982 MMC (PR)
                                     )
            Petitioner,              )     **ORDER DENYING PETITION FOR
                                     )     WRIT OF HABEAS CORPUS**
     v.                              )
                                     )
TOM L. CAREY, Warden,                )
                                     )
            Respondent.              )
_____       )
___

        Robert Wayne Rogers ("petitioner"), a California prisoner, proceeding pro so, filed the

above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C § 2254.  The Court

ordered respondent to show cause why the petition should not be granted based on petitioner's

nine claims for relief.  Respondent has filed an answer, accompanied by a memorandum and

exhibits, contending that the petition should be denied.  Petitioner has filed a traverse.

**PROCEDURAL BACKGROUND**

        In 1998, a jury in Santa Cruz County Superior Court found petitioner guilty of three

counts of robbery and one count of false imprisonment.  The trial court, finding petitioner had

sustained seven prior "strike" convictions and served three prior prison terms, sentenced him

to 92 years to life in state prison.  The California Court of Appeal affirmed, and the Supreme

Court of California denied the petition for review, as well as a subsequent petition for a writ of

habeas corpus.

**FACTUAL BACKGROUND**

**United States District Court**
For the Northern District of California

1    Between May 9, 1997 and June 18, 1997, four robberies occurred in and around Santa

2    Cruz, California.

3    Tracy Mitchell ("Mitchell") gave the following testimony at trial.  On May 9, 1997, she

4    and Melissa Colen ("Colen") worked at Togo's Eatery, a restaurant in Santa Cruz.  Just after the

5    restaurant opened at 10:30 a.m., a man appeared in front of the restaurant and asked Mitchell if

6    it was open.  She told him that it was, and then went to the back of the restaurant.  When she

7    returned to the main room, she saw the man on the employees' side of the counter, next to

8    Colen.  He told Mitchell to open the cash register.  He had a blue and white checkered flannel

9    shirt wrapped around one of his hands, which he pushed into Mitchell's side.  Believing he had

10   a gun, she opened the register, after which he took all the bills and ran out of the restaurant.

11   The suspect was white, tanned, with very short hair, wearing a cap and black sunglasses, 5'10",

12   170 lbs., and in his mid-to-late 30s.  He had a barbed wire tattoo around one wrist.  Mitchell

13   identified petitioner as the robber in a photographic lineup, in a live lineup, and at trial.  Colen

14   likewise testified that the robber had a barbed wire tattoo around his wrist.  Although Colen did

15   not pick petitioner out of a photographic lineup, she did identify him at trial.

16   Susan Payne ("Payne") gave the following testimony at trial.  She was working in an

17   Entenmann's Bakery in Santa Cruz on May 12, 1997.  A man bought a package of dinner rolls,

18   and a few minutes later, when the store emptied of customers, he returned and told her to get

19   him the money from the safe.  One of his hands was wrapped in a sweatshirt or jacket, and he

20   pushed it into her side.  Fearing he might have a gun, she walked him to the store's office where

21   she gave him two canvas bags of money.  He then walked her back to the cash register and told

22   her to open it.  When she did, he took all the bills, told her to go back to the office, and then

23   left.  Payne described the man as white, with short hair under a cap, thin, 5'7" to 5'8", between

24   35 and 40 years old, and wearing a blue and green plaid shirt, blue jeans, and sunglasses.  Payne

25   identified petitioner as the robber in a photographic lineup and at trial.

26   Ruth Cambrun ("Cambrun") testified that she, Joan Lind ("Lind") and Sharon Evans

27   ("Evans") were working at Beverly Fabrics in Soquel, California on the afternoon of May 26,

28   1997, when a man wearing a white bandana came into the store.  Cambrun watched him browse

2

**United States District Court**
For the Northern District of California

1    for a few minutes, because he "didn't look like somebody who would be shopping for craft

2    products or fabric products." (Reporter's Transcript ("RT") at 631-32). Cambrun described

3    the man as a little taller than 5'9". Cambrun identified petitioner in both a live lineup and at

4    trial. Lind testified that she was working at a register when she saw a man in line with a stark-

5    white bandana over his forehead and a jacket over one arm. Lind described the man as having a

6    "medium complexion," a clean- shaven and oval-shaped face, dark hair, 5'9" to 5'10", and in his

7    late 20s to mid 30s. She assisted a sketch artist in producing a sketch of the suspect. Lind

8    identified petitioner in a photographic lineup and at trial, but picked a different person in a live

9    lineup. Evans testified that the man with the bandana reached her register and handed her a

10   piece of paper that said, "Give me your money. I have a gun." (RT 595-96). Noting that the

11   man had a jacket draped over his hand and that it was pointed at her, she opened the register and

12   handed him the bills. Evans testified that the man was white and 5'9" or 5'10", but she was too

13   frightened to remember more details. Evans identified petitioner in a photographic lineup, a

14   live lineup, and at trial, but testified that she had some uncertainty about her identifications.

15          Teresa Gera ("Gera") gave the following testimony at trial. On June 18, 1997, she and

16   Julie Johnson ("Johnson") were working at Kamian's Pharmacy in Rio Del Mar. Gera was at

17   the front register shortly after 3:00 p.m., at which time a man came in wearing a white hooded

18   sweatshirt with the hood up. After browsing briefly, he put a paper bag on the counter and told

19   Gera there was a gun inside. Believing him, Gera opened the register and started to give him

20   the bills, but the man reached into the register, took the bills and ran out the door. Johnson ran

21   after him. She had noticed the man when he entered the store, because his clothes did not suit

22   the temperature that day. She followed him into a shopping center and eventually to a parking

23   lot, where she saw him get into a faded blue sedan. She concentrated on a license plate number

24   and repeated it to a man standing nearby, who wrote it down and gave it back to her. Gera

25   described the robber as having an olive tan complexion and dark hair, about six feet tall; she

26   picked petitioner out of a photographic lineup and identified him at trial. Johnson also picked

27   petitioner out of a photographic lineup, explaining that she was 70 percent sure of the

28

3

United States District Court

For the Northern District of California

identification; at trial she gave a somewhat qualified identification of petitioner as the robber.[1]

The parties stipulated that in 1991, petitioner had been convicted of three robberies in Santa Cruz County.[2]  Evidence of these robberies was introduced at trial, and the jury was instructed that such evidence could only be considered to prove identity and a common design or plan, not to show a propensity to commit crime.  The first robbery took place on August 3, 1991 at the same Entenmann's Bakery as the May 12, 1997 robbery described above.  Susan Farmer ("Farmer") testified that during the day, while she was working alone, petitioner came behind the counter, stood behind her with something pointed at her through his sweatshirt pocket, pushed her into the register, and demanded that she open it.  Believing he had a gun, she opened the register, after which he reached in, took the money, told her to get on the floor, and left.  Farmer identified petitioner in a live lineup and at the 1998 trial.  The next robbery took place on August 12, 1991 at a toy store in Santa Cruz.  Mary Brooks ("Brooks") testified that while she was working alone in the store that day, petitioner entered the store, browsed briefly, and then pushed her to the register.  Brooks testified that one of his hands was wrapped in a yellow shirt and pointed at her as if it held a gun.  Believing he had a gun, Brooks opened the register, at which time petitioner reached in, took the bills and walked away.  Brooks identified petitioner in a photographic lineup, a live lineup and at the 1998 trial.  Lastly, Darsy Hines ("Hines") testified that on August 24, 1991, while she was working at a Watsonville bread store that day, petitioner came in, bought some small items, and then came around the counter and told her to open the register.  She testified that petitioner's hand was inside a duffle bag, which he pressed against her.  Believing he had a gun, she opened the register, after which he took the bills and left.  Hines identified petitioner in a live lineup and at the 1998 trial.

Detective Fred Plageman ("Plageman") gave the following testimony regarding his investigation of the 1997 robberies.  The license plate number Johnson had noted after the June 18 Kamian's Pharmacy robbery was registered to petitioner.  Plageman further testified

---

[1]She stated: "Well, based on the hairstyle and the color, I remember the dark hair and he either had no hair or – I think it would be this gentleman over here."  (RT 709).

[2]Petitioner pleaded guilty to these three prior robberies.

4

United States District Court
For the Northern District of California

1   as follows.  On  June 18, the day of the pharmacy robbery, Plageman went to petitioner's

2   mother's house and spoke to petitioner's brother, Derrick, who told Plageman that he had last

3   seen petitioner five days earlier in the blue car, which their mother had given to petitioner.  On

4   June 23, 1997, Derrick phoned Plagemen and reported that he found a pink slip for the blue car

5   along with a note from petitioner saying, "Mom, here's the pink slip and the keys to the car.  I

6   released interest in the car for you.  Love, Robert."  (RT 734-35).  The car was parked near

7   petitioner's mother's home, and petitioner's fingerprints were on it.  On July 20, 1997,

8   petitioner was arrested in a motel in Salinas.  In his motel room and car, a red BMW belonging

9   to petitioner's mother, police found clothing matching or consistent with the witnesses'

10  description of clothing and other items worn in the 1997 robberies, specifically, a blue and

11  green plaid shirt, blue jeans, a black sweatshirt and black sunglasses.

12       Petitioner had been released on parole in connection with his prior prison term on April

13  8, 1997.  He is 5'9", and at the time of his arrest he was 36 years old, weighing 150 pounds.  He

14  has a barbed wire tattoo around his left wrist.

15       A forensic psychologist, Robert Shomer ("Dr. Shomer") testified for the defense on the

16  subject of the reliability of eyewitness identification.  Dr. Shomer opined that eyewitness

17  identification is "[e]xtremely unreliable as it pertains to the identification of strangers seen

18  once under stressful, or nonoptimal circumstances."  (RT 1282).  Dr. Shomer further testified

19  that a witness's memory of how a suspect looked at the time of the crime can become blended

20  with memories of investigative lineups or of casual contacts with other people.  He also

21  testified that an identification becomes unreliable if the witness is aware the focus of

22  suspicion is on a particular individual.  Finally, he explained that in some cases DNA evidence

23  has exonerated people who had been identified by an eyewitness.

24       Petitioner testified that although he committed the 1991 robberies, he is innocent of

25  the charged crimes.  He explained that on several occasions he had been to the shopping center

26  where Kamian's Pharmacy is located and on several occasions had picked up his sisters's

27  children from a school where Cambrun works.  He testified that Cambrun looked familiar to

28  him.  The parties stipulated there are men who have tattoos similar to petitioner's who were not

5

suspects in the case.

**DISCUSSION**

A.      Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000).  Habeas relief is warranted only if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 121 S. Ct. 1910, 1920 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  A federal court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

B.      Legal Claims

Petitioner makes the following claims: (1) his right to a fair trial under the Due Process Clause was violated when the trial court denied his motion to sever the trial on the robbery counts; (2) his right to a fair trial under the Due Process Clause was violated when the trial court admitted evidence of the fact and the nature of petitioner's prior robberies;[3] (3) the trial court admitted identification evidence obtained at an unconstitutional photographic lineup; (4) prosecutorial misconduct during the presentation of evidence and closing argument violated

---

[3]This claim is a combination of claims 2 and 3 in the petition.

United States District Court
For the Northern District of California

petitioner's right to a fair trial under the Due Process Clause;[4] (5) the cumulative effect of the foregoing trial errors rendered his trial fundamentally unfair in violation of his right to due process; (6) his sentence under the "Three Strikes" laws violates the Eighth Amendment and the Ex Post Facto Clause, as well as his right to due process insofar as it violates his prior plea agreements;[5] (7) the trial court denied him the fair trial guaranteed by due process by admitting evidence of his prior conviction for burglary, his drug addiction and his parole status; by preventing the defense from impeaching prosecution witnesses; by admitting cumulative prosecution evidence; by denying his motion for mistrial; by leaving the courtroom during the readback of testimony, and by improperly questioning witnesses; (8) the trial judge's bias against petitioner violated petitioner's constitutional rights; and (9) his appellate counsel provided ineffective assistance in violation of his right to due process.

      1.    <u>Severance Motion</u>

      Petitioner claims that the failure to sever the four different robbery charges for purposes of trial, i.e., to conduct four separate trials, violated his due process right to a fair trial.  A joinder, or denial of severance, of counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  <u>Grisby v. Blodgett</u>, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court reviewing a state conviction under 28 U.S.C. § 2254 is not concerned with state law governing severance or joinder in state trials.  <u>Id.</u>  Nor is it concerned with procedural rights to severance afforded in federal trials.  <u>Id.</u>  Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution.  To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair.  <u>Id.</u>  Such prejudice is shown if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict.  <u>Sandoval v. Calderon</u>, 241 F.3d 765, 772 (9th Cir. 2000).

---

    [4]This claim is a combination of claims 5 and 9 in the petition.

    [5]This claim is a combination of claims 7 and 12 in the petition.

United States District Court

For the Northern District of California

There is a "high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible."  United States v. Lewis, 787 F.2d 1318, 1322 (9th Cir. 1986).  In other words, the risk of prejudice is greatly increased when the evidence is not cross-admissible on the various charges.  See Bean v. Calderon, 163 F.3d 1073, 1084-85 (9th Cir. 1998).  The California Court of Appeal agreed with the trial court that the evidence was cross-admissible because the charged robberies were sufficiently similar that their evidence showed identity or a common plan.  In all but one of the incidents the robber concealed his hand in clothing and pointed it at the store clerk as though he had a gun; and in the other robbery, he employed a similar ploy of telling the clerk that he had a gun hidden in a paper bag.  All of the robberies occurred within a period of six weeks,  during daylight hours, and at small retail businesses in and around Santa Cruz, where plaintiff lived.  In each instance, the robber had no accomplice, he chose a store where only women were working, he "cased" the store by pretending to be a customer, he took only cash, and, in all but one instance, he reached into the register himself.  Finally, there was considerable overlap in the witnesses' description of the robber.  This Court agrees with the California Court of Appeal that the similarities are sufficient, and, in any event, the finding that the evidence was cross-admissible as to the different charges is a matter of California law binding on this Court.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988) (holding determination of state law by state appellate court is binding in federal habeas action).

The risk of prejudice from joinder is diminished where the trier of fact compartmentalizes any evidence that is not cross-admissible, and there is distinct evidence supporting the counts for which the evidence is not cross-admissible.  See Bean, 163 F.3d at 1085-86.  In this case, the jury was given an instruction pursuant to CALJIC No. 17.02 as follows: "Each count charges a distinct crime.  You must decide each count separately.  The defendant may be found guilty or not guilty of any or all of the crimes charged.  Your finding as to each count must be stated in separate verdicts."  The jury is presumed to have followed this

8

United States District Court
For the Northern District of California

1   instruction.[6]  Moreover, where, as here, the trier of fact did not convict on all counts, the jury

2   presumably was able to compartmentalize the evidence.  See Park v. California, 202 F.3d 1146,

3   1149-50 (9th Cir. 2000).  In this case, petitioner was acquitted of the charge of robbing Sharon

4   Evans at Beverly Fabrics.[7]

5          Prejudice can also arise when the evidence on certain counts is substantially weaker

6   than the evidence on the other counts.  Bean, 163 F.3d at 1084-85.  Here, the evidence against

7   petitioner on the different counts was of relatively equal strength, as described by the

8   California Court of Appeal:

9          Each case had its own strength.  Counts 1 and 2 charged defendant with robbery
           and false imprisonment of Susan Payne at Entenmann's Orowheat Bakery Outlet.
10         Payne positively identified defendant at a photographic lineup, and defendant was
           convicted of committing a previous robbery at the same store.  Count 3 charged
11         defendant with robbery of Sharon Evans at Beverly Fabrics.  Two witnesses
           (Evans and Joan Lind) positively identified defendant at a photographic line-up.
12         Although Evans wrote "maybe" on the comments card and Lind wrote "[n]ot
           positive," their identifications bolstered one another.  In addition, Evans and Ruth
13         Cambrun both selected defendant at a physical line-up.  Count 4 charged
           defendant with robbery of Teresa Gera at Kamian's Pharmacy.  Gera and another
14         witness, Julie Johnson, positively identified defendant at a photographic line-up.
           Although Gera indicated she was not certain of her identification, the fact that
15         Johnson also selected defendant's photograph bolstered Gera's identification.
           Defendant was also connected to the robbery charged in count 4 by the
16         identification of his vehicle.  Count 5 charged defendant with robbery of Tracy
           Mitchell and Melissa Colen at Togo's Eatery.  Mitchell positively identified
17         defendant at a photographic line-up as well as a physical line-up.  She also
           identified the barbed wire tattoo on defendant's wrist.
18
19   Slip Op. at 15.  Nor was this a case in which any of the joined charges was substantially more

20   serious or inflammatory than others.  Three of the four incidents were only robberies, and in

21   the one incident involving false imprisonment, there was no physical injury and no more threat

22   of harm than in the other incidents.  Overall, the evidence supporting the various charges

23   against petitioner was comparable in both strength and seriousness, diminishing the risk of

24   prejudice from joinder of the charges.

25          In sum, the record reflects that the jury adhered to the limits on the cross-admissibility

26   _____

27        [6]See Tan v. Runnels, 413 F.3d 1101, 1115 (9th Cir. 2005) ("we presume jurors follow the court's
     instructions absent extraordinary circumstances").

28        [7]Additionally, the jury did not find true any of the firearm use allegations.

9

of the evidence and compartmentalized the evidence so as not to consider evidence on charges

for which the evidence was not otherwise admissible, the evidence was not substantially weaker

on any of the charges, and the charges were of comparable seriousness.  Consequently, the

joinder did not prejudice petitioner such as to violate his due process right to a fair trial.

2.     Evidence of petitioner's prior robberies

Petitioner claims that his right to a fair trial under the Due Process Clause was violated

when the trial court admitted evidence of the fact and the nature of petitioner's three 1991

robbery convictions.  A state court's admission of evidence infringes a defendant's

constitutional right to due process if the evidence rendered the trial fundamentally unfair.  See

Pulley v. Harris, 465 U.S. 37, 41 (1984).  In particular, the due process inquiry in federal

habeas review is whether the admission of evidence was arbitrary or so prejudicial that it

rendered the trial fundamentally unfair.  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.

1995).  Only if there are no permissible inferences that the jury may draw from the evidence,

however, can its admission violate a defendant's right to due process.  Jammal v. Van de Kamp,

926 F.2d 918, 920 (9th Cir. 1991).

Here, the trial court and Court of Appeal found the evidence of petitioner's 1991

convictions admissible pursuant to California Evidence Code §1101(b).  Section 1101(a)

provides, with several specified exceptions, that evidence of character is not admissible to

prove a person's conduct on a particular occasion.  Section 1101(b) provides that § 1101(a)

does not prohibit evidence of a person's prior crime when "relevant to prove some fact (such

as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake . . . )

other than his or her disposition to commit such an act."  In this case, after conducting a

hearing on the issue, the trial court admitted evidence of three 1991 robbery convictions to

show "identity and common plan," in light of their "distinctive similarities to the charged

offenses."[8]  In the 1991 robberies, as in the charged robberies, the robber hid what could have

been either an actual or simulated gun in a bag or piece of clothing and used it to threaten the

[8]The prosecution sought admission of five 1991 robbery convictions, but the trial court only admitted three.

10

United States District Court

For the Northern District of California

1    victims.  As the trial court found, this method was a sufficiently distinctive feature that it could

2    be considered a "signature," from which the jury could reasonably draw the inference that one

3    person had committed both the prior and charged robberies.  Additionally, there were other

4    similarities between the 1991 and 1997 robberies that could be considered part of the same

5    modus operandi: all were daytime robberies of small retail businesses in and around Santa

6    Cruz[9], and the victim in each instance was a woman working at the cash register.

7           Moreover, prior to admitting the evidence, the trial court weighed its probative value

8    against its prejudicial effect.  See e.g. Terrovona v. Kincheloe, 912 F.2d 1176, 1180-81 (9th

9    Cir. 1990) (finding admission of testimony as to prior acts did not deprive defendant of due

10   process, where trial court balanced probative value against prejudicial effect and gave jury

11   cautionary instruction).  The trial court found the evidence of the 1991 robberies was "highly

12   probative" of identity and common plan, that petitioner was in fact convicted of the prior

13   robberies, and that the prior robberies were not more inflammatory than the charged robberies.

14   Finally, the risk of unfairness from the admission of the prior robberies was reduced by the

15   limiting instruction given to the jury that it could only consider the evidence to establish

16   identity or a common plan, and not to show a propensity to commit the charged crimes.  See

17   e.g.  Houston  v. Roe, 177 F.3d 901, 910 n.6 (9th Cir. 1999) (finding admission of similar

18   prior acts to show motive and intent, coupled with limiting instructions, did not constitute due

19   process violation).

20          In sum, the jury could reasonably infer identity or a common plan from the evidence of

21   petitioner's 1991 robbery convictions, the trial court weighed the probative value of that

22   evidence against its prejudicial effect, and the trial court gave an appropriate limiting

23   instruction to the jury regarding its use of the evidence.  Under these circumstances, the

24   admission of the evidence did not render the trial fundamentally unfair such as to violate his

25   right to due process.

26          3.    Photographic Lineup

27

28          _____

            [9]Indeed, one of the 1991 robberies was of the same bakery as one of the 1997 robberies.

**United States District Court**
For the Northern District of California

Petitioner claims that the photographic lineup procedure was so suggestive that the admission of all of the identification evidence admitted based on that lineup – including the live lineup identifications and the in-court identifications – violated his right to due process. "A conviction which rests on a mistaken identification is a gross miscarriage of justice." Stovall v. Denno, 388 U.S. 293, 297 (1967).  Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive.  "It is the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 U.S. 188, 198 (1972).  Due process protects against the admission of evidence deriving from suggestive pretrial identification procedures. Id. at 196.  Unnecessarily suggestive pretrial identification procedures alone do not require exclusion of in-court identification testimony, however; reliability is the linchpin in determining the admissibility of identification testimony.  See Manson v. Brathwaite, 432 U.S. 98, 100-14 (1977).  Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  See Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986).

Petitioner argues that the photographic lineup was unduly suggestive.  An identification procedure is impermissibly suggestive when it "emphasize[s] the focus upon a single individual," thereby increasing the likelihood of misidentification.  See United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985).  Here, petitioner complains that one of the six people in the photographs was wearing a shirt with epaulets.  The police included a photograph of a deputy sheriff in the lineup, and although he was not in uniform, he was wearing a shirt with epaulets.  Petitioner complains that this attire suggested that the individual was a law enforcement officer, and thus could not be the robber.  Even if the witnesses' ruled out this one individual because of the epaulets, their focus was not narrowed to a single individual; they still had five other choices.  Petitioner provides no authority, and this Court is aware of none, indicating that having five alternative choices renders a lineup procedure impermissibly

**United States District Court**
For the Northern District of California

1  suggestive.  Cf. Simmons v. United States, 390 U.S. 377, 383 (1968) (describing examples of

2  impermissible suggestiveness, such as the display of only one photograph, the repeated

3  showing of an individual's photograph, an indication by the police that they have other evidence

4  pointing to the guilt of one of the individuals).

5  Petitioner also claims that two of the individuals in the photographs appeared to be

6  Hispanic.[10]  The California Court of Appeal reviewed the pictures independently, and found that

7  "[c]ontrary to defendant's assertion, none of the foils appears to be Hispanic and none has a

8  significantly different complexion than defendant."[11]  Slip Op. at 21.  As petitioner presents no

9  grounds for questioning this factual finding by the state court, this Court must defer to it on

10  habeas review.  See 28 U.S.C. § 2254(d)(2) (providing habeas relief may only be awarded if

11  state court's factual finding unreasonable).  Moreover, if petitioner perhaps is suggesting that

12  two of the suspects had dark skin, that characteristic would not serve to eliminate those

13  individuals as suspects, in that one witness had described the robber as being "tanned", and

14  another witness described the robber as having an "olive tan" complexion.

15  In sum, as there is no indication that the witnesses' focus was narrowed to a single

16  individual, the admission of the identification evidence based on the photographic lineup did

17  not violate petitioner's right to due process.

18  4.  Prosecutorial Misconduct

19  Petitioner claims that various instances of misconduct by the prosecutor caused a

20  violation of his right to due process.  Misconduct by the prosecutor may amount to a violation

21  of a defendant's due process right to a fair trial.  See Darden v. Wainwright, 477 U.S. 168, 181

22  (1986).  The first issue is whether the prosecutor's remarks and other conduct were improper;

23  if so, the Court then determines whether such conduct infected the trial with unfairness to such

24  an extent as to violate due process.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  In

25  resolving the latter issue, the Court "examin[es] the entire proceedings."  Johnson v. Sublett,

26

27  [10]It is not clear from the record whether one of the two individuals who allegedly appeared to be Hispanic was also the individual wearing epaulets.

28  [11]The record does not indicate petitioner's ethnicity.

13

63 F.3d 926, 929 (9th Cir. 1995).  If the prosecutor's conduct has violated the petitioner's right to due process, habeas relief is granted only if there has been "actual prejudice," i.e., that the misconduct had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637.

a.     Comments regarding petitioner's possession of $1700 in cash

Petitioner claims the prosecutor referred to a fact not in evidence during closing argument, namely that petitioner had $1700 in cash when the police arrested him.  Defense counsel objected to the remark as misstating the evidence, but the trial court overruled the objection.  The California Court of Appeal found, and respondent concedes, that the prosecutor's comments were improper because evidence of this fact had not been presented to the jury.  As set forth below, however, considering the trial record as a whole, the prosecutor's remark did not so infect the trial as to violate petitioner's due process right to a fair trial.

Factors that a court may take into account in determining whether misconduct rendered the trial fundamentally unfair are: (1) whether a curative instruction was issued, see Darden, 477 U.S. at 182; (2) the weight of evidence of guilt, United States v. Young, 470 U.S. 1, 19 (1985); (3) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (4) whether the misconduct relates to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972); and (5) whether a prosecutor's comment misstates or manipulates the evidence, see Darden, 477 U.S. at 182.

Here, the prosecutor made the comment only once, in his rebuttal argument; consequently, the content was not emphasized to the jury, either through repetition, or as a focus of the prosecutor's closing remarks.  Additionally, the jury was instructed to decide the case based on the evidence received at trial, and that the statements of counsel do not constitute such evidence.  See CALJIC 1.00, 1.02 The jury is presumed to have followed those instructions.  See Tan v. Runnels, 413 F.3d 1101, 1113, 1115 (9th Cir. 2005).  As the jury did not receive any evidence to the effect that petitioner possessed $1700 in cash, it is presumed that the jury did not consider the prosecutor's comment in its deliberations.  Finally, as summarized by the California Court of Appeal, the other evidence linking petitioner to the

14

robberies was strong:

> He was identified by nearly all of the victims at photographic line-ups, physical line-ups, and in court.  He was linked to particular robberies by his tattoo and his vehicle.  The robberies were all committed in a similarly distinctive fashion, supporting the inference that the same person committed each of them. [He] was previously convicted of other robberies, which were also committed in the same distinctive fashion.

Slip Op. at 22-23.  Given the strength of the other evidence against petitioner, the fact that the prosecutor's misstatement was a single isolated occurrence, and the instructions to the jury that the prosecutor's statements were not evidence, the Court concludes the prosecutor's statement did not render the trial fundamentally unfair such as to violate petitioner's right to due process.

b.      Location of Melissa Colen

Petitioner claims that the prosecutor's failure to inform the defense of the updated address of Colen, a witness to the Togo's robbery, violated the prosecution's constitutional duty under Brady v. Maryland, 373 U.S. 83, 87 (1963).  Brady requires the prosecution to surrender to the defendant favorable evidence that is "material either to guilt or to punishment."  Id.  It is undisputed that prior to trial the prosecution turned over Colen's name, location, and all information in its possession regarding what Colen had witnessed.[12]  Prior to trial, the defense investigator was not able to locate Colen at the address provided by the prosecutor.  At trial, a police officer testified they were not able to locate Colen for the live lineup because she had moved.  The prosecution did not call Colen as a witness.  After closing argument and before jury deliberations, the defense located Colen,[13] and the trial court reopened the evidence, allowing the defense to present her testimony to the jury.

Petitioner complains that the prosecutor failed to provide the defense with Colen's new

---

[12]Colen had selected the photograph of an individual other than petitioner from the photographic lineup.

[13]It is not clear from the record how defense counsel ultimately found Colen.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  address before trial.[14]  The record is clear that defense counsel did not ask for an updated

2  address from the prosecution, and petitioner cites no Supreme Court authority, and this court

3  is aware of none, that <u>Brady</u> requires the prosecution to notify the defense of a witness's

4  address change.  Generally, where the government discloses all the information necessary for

5  the defense to discover the alleged <u>Brady</u> material on its own, the government is not guilty of

6  suppressing evidence favorable to the defendant.  <u>See</u> <u>United States v. Bracy</u>, 67 F.3d 1421,

7  1428-29 (9th Cir. 1995).  Petitioner was given Colen's name and what was at one time her

8  correct address and phone number.  From this information, the defense could have discovered

9  Colen's more current address on its own.  As a consequence, there is no indication that the

10  prosecution violated its obligations under <u>Brady</u>.  Moreover, the defense ultimately located

11  Colen and presented her testimony to the jury.  Petitioner does not indicate how, indeed even

12  whether, her testimony would have differed had she been located prior to trial.  Consequently,

13  there is no indication that petitioner suffered any prejudice from not receiving Colen's updated

14  address prior to trial.[15]  Accordingly, this claim of prosecutorial misconduct fails.

c.    <u>Comments regarding plea bargain</u>

16       Petitioner claims that the prosecutor, during closing argument, made improper remarks

17  regarding whether petitioner wanted to pursue a plea bargain.  The Ninth Circuit has recognized

18  and applied California's contemporaneous objection rule, under which a defendant must make

19  an objection at trial in order to preserve a claim on appeal, as grounds for denying a federal

20  habeas claim under the doctrine of procedural default where, as here, there was a complete

21  failure to object at trial.  <u>See</u> <u>Vansickel v. White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999).

22  Because petitioner made no objection to the prosecutor's statement at trial, as is required

23  _____

24       [14]It appears from the record that at some point prior to trial, the witness coordinator in the
prosecutor's office obtained updated contact information for Colen.  There is no claim by petitioner that the
25  prosecution intentionally withheld the witness's current address from the defense.

26       [15]Petitioner also complains about the prosecutor's statement during closing argument that she did
not know where Colen was, a statement made in rebuttal to defense counsel's criticism of the prosecution
for not calling Colen as a witness.  Although it appears that the prosecutor's office did have Colen's
27  updated contact information, the record is not clear whether the prosecutor herself knew that to be the
case.  In any event, petitioner was not prejudiced by the prosecutor's statement because defense counsel
28  ultimately did locate Colen and presented her testimony at trial.

United States District Court

For the Northern District of California

under California's contemporaneous objection rule, this claim is procedurally defaulted.  See

id.  Although a petitioner may avoid procedural default by showing the requisite "cause and

prejudice," see id., petitioner here has made no such showing, or even an effort to do so.

In any event, the remarks by the prosecutor were not improper.  The prosecutor stated as

follows:

> Everyone is entitled to a trial, even if the evidence is overwhelming. Even if
> they're guilty, they're entitled to a trial.  You can also understand that people
> choose to enter pleas of guilt for different reasons.  And he himself admitted, I
> got a bargain, I got a plea bargain.  You heard the other charges were dismissed.[16]
> *No bargaining in this case.  Somebody's got to say, enough is enough.*

(RT 1457 (emphasis added)).  Petitioner argues that the above-emphasized portion of the

statement incorrectly implied that petitioner sought a plea bargain and was turned down by the

prosecutor's office.  The Court disagrees.  The undisputed evidence in the record on this

subject, which came from petitioner's testimony without any objection by the prosecutor, is

that petitioner was offered a plea bargain and *petitioner* turned it down.  In light of the state of

the record, the prosecutor's remarks are more reasonably understood as a comment that not

every case can be settled.  In any event, even if the jury understood the comment to mean

something different, they were expressly instructed by the trial judge that statements of

counsel are not evidence and that they could decide the case based only on the evidence

presented.  As noted, the undisputed evidence on this subject was that petitioner, not the

prosecution, wanted to take the case to trial.  Accordingly, this claim of prosecutorial

misconduct fails.

        d.      Witness testimony regarding cancelled lineup

The trial court denied the prosecution's motion in limine to present evidence about

petitioner's refusal to participate in the initial live lineup set up by the police.[17]  Petitioner

---

[16]These remarks regarding a plea bargain and dismissal of charges refer to testimony given by
petitioner about his having pled guilty to the 1991 charges pursuant to a plea agreement.

[17]Petitioner refused because he had not yet obtained counsel.  Thereafter, he participated in a
second lineup.  There is no Sixth Amendment right to counsel at a pre-indictment lineup.  See Kirby v.
Illinois, 406 U.S. 682, 688-91 (1972).  The trial court ruled, however, that evidence of petitioner's refusal
was more prejudicial than probative and, accordingly, held the evidence inadmissible under § 352 of the

complains that the prosecutor violated this ruling by, on several occasions, questioning

witnesses about the cancellation of the initial live lineup.  Petitioner argues that such

questioning was an improper comment on petitioner's post-arrest silence and, as such,

prohibited by Doyle v. Ohio, 426 U.S. 610, 611 (1976).  Petitioner is mistaken.  First, Doyle

applies to comments on a witness's silence after having been read Miranda warnings.  Id.

Petitioner cites no case equating a refusal to participate in a lineup with an assertion of one's

First Amendment rights.   More importantly, in none of the above instances cited by petitioner

did the prosecutor or witness make any reference to the fact that petitioner had refused to

participate in the lineup.  The witnesses testified only to the fact that the lineup was cancelled,

not the reason why it was cancelled.  Accordingly, this claim of prosecutorial misconduct fails.

> e.     Comments regarding sentencing and petitioner's testifying

During his testimony, petitioner told the jury that the instant case is a three-strikes case.

An objection to this testimony was sustained, based on the trial court's prior ruling that the

parties could not refer to such fact.  Petitioner claims the following comments by the

prosecutor during closing argument regarding that exchange were improper:

> Mr. Rogers couldn't wait to tell you this was a three-strikes case.  Mr. Rogers
> did that despite the Court's ruling there was to be no mention.  He acknowledged
> that ruling.  You're not to consider penalty in any way.  It is for His Honor.  You
> must make decisions based on the facts and His Honor has the option of
> sentencing as he thinks appropriate.  He can strike those strikes.  He does not
> have to sentence Mr. Rogers [18] to 25 years to life.  It's absolutely the statement
> of the law.  So don't be thrown by that because that's what Mr. Rogers was doing.
> His thought process is, I have nothing to lose.  I'm going to get up there and say
> I'm innocent.  I don't know where I was, I don't know what I did.  I tried to turn
> my life around.  But, really, what he wanted to do was let you folks know about
> the possible penalty.  First of all, it's up to the Judge.  It doesn't have to be
> imposed but it's improper.  You discuss the facts and you return the right verdict,
> and His Honor will deal with what's the appropriate penalty.

RT 1456.

Petitioner complains that in this statement, the prosecutor "made derogatory remarks

about petitioner's right to testify [and] gave her personal opinion on the reasons petitioner

---

California Evidence Code.

[18]At this point, defense counsel interposed an objection, which objection was overruled.

18

choose [sic] to testify."   While a prosecutor may not comment on a defendant's decision *not*
to testify, <u>see</u> <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965), there is no such prohibition as
to the prosecutor's commenting on the defendant's testimony where the defendant does
choose to testify.  Here, the prosecutor simply argued that petitioner's testimony was so weak
that petitioner appeared to be using the opportunity primarily to put before the jury the fact that
he faced a three-strikes sentence.  Petitioner provides no authority, and the Court is aware of
none, that such an argument constitutes other than fair comment.  Petitioner also argues that in
the above-quoted argument, the prosecutor improperly commented on the trial court's
sentencing options.  Although such comments were improper,[19] petitioner has failed to show
he suffered any prejudice thereby.  Once petitioner suggested to the jury that he would, if
convicted, receive a very severe sentence, with the possibility of improperly influencing one or
more jurors to acquit irrespective of the merits of the prosecution's case, any suggestion by
the prosecution that petitioner could receive a lesser sentence would likely do no more than
neutralize any improper influence engendered by petitioner's testimony concerning his
sentence.

In sum, the above-referenced portion of the prosecutor's closing argument did not
render the trial fundamentally unfair such as to violate petitioner's constitutional rights.

       f.      <u>Vouching</u>

Petitioner claims that, during closing argument, the prosecutor improperly vouched for
the credibility of prosecution witnesses.  As there was no objection to these comments at trial,
this claim is procedurally defaulted for the same reasons discussed above with respect to
petitioner's claim of misconduct by reference to plea bargaining.  <u>See</u> <u>Vansickel v. White</u>, 166
F.3d at 957-58.[20]

In any event, the subject remarks do not constitute impermissible vouching.  The

---

[19]Petitioner also argues that the comments violated the "separation of powers principles."  There is
no authority to support this contention, and, in any event, the prosecutor's comments in no way interfered
with the trial court's sentencing of petitioner.

[20]Again, petitioner makes no effort to show "cause and prejudice."  <u>See</u> <u>Vansickel</u>, 166 F.3d at
957-58.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   prosecutor argued as follows:

2       Is there any reason these ladies would come in here and say, this man robbed me,
    but for the fact he did?  They have no reason to finger this guy.  They have no

3   animosity towards this man.  They don't even have prior contact.  There is no
    reason for them particularly to identify this man except for one: He's the man

4   who did it.  And that's an issue of their credibility.
    . . .

5   [W]e don't have just a photo spread in this case.  Detective Plageman went the
    extra mile and arranged a physical lineup so that the women could see this man in

6   person, just to make sure we got the right guy.
    . . .

7   And once again, go back to your own personal integrity and the witnesses
    integrity.  Would they identify someone just because they're in court and just

8   because he's here?  There's absolutely nothing that suggests that.
    . . .

9   One of the things for you to assess is how afraid is Sharon Evans, how afraid is
    she in Court to say that?  Maybe that's part of what is working on her, in her

10  hesitation of just saying, I can't be sure.  Perhaps she doesn't want to be in that
    position.  But she had no qualifications when she picked him in the lineup in

11  number 5 even though there's a space for comments and even though she's
    written comments before.

12  . . .
    And once again these are people who are capable of saying, I'm not sure.  These

13  are people with integrity who would say, I'm not sure if that's him.

14  (RT 1374-93).

15      Improper vouching for the credibility of a witness occurs when the prosecutor places

16  the prestige of the government behind the witness or suggests that information not presented to

17  the jury supports the witness's testimony.  United States v. Parker, 241 F.3d 1114, 1119-20

18  (9th Cir. 2001).  Here, the prosecutor was arguing that the eyewitnesses were credible, in a

19  case that turned largely on their credibility, and in so doing, argued they had no motive to lie.

20  Such an argument does not constitute vouching.  See United States v. Nash, 115 F.3d 1431,

21  14329 (9th Cir. 1997).  Nor did the prosecutor engage in vouching in explaining why the

22  police went to the effort of creating a live lineup.  The comment "just to make sure we got the

23  right guy" is reasonably understood to mean law enforcement took every precaution to avoid a

24  misidentification.  At no time did the prosecutor place the prestige of the government behind

25  the witnesses or suggest any extrajudicial information supporting their credibility.  Cf., e.g.,

26  United States v. Sarkisian, 197 F.3d 966, 990 (9th Cir. 1999) (finding improper vouching

27  where jurors asked to rely on credibility of prosecutors to reject testimony favorable to the

28  defense).  Accordingly, petitioner's claim that the prosecutor violated his rights by vouching

for witnesses fails.

### g.   Prosecutor's history

Petitioner claims that the District Attorney violated petitioner's constitutional rights by assigning a deputy who had a history of misconduct.  Petitioner does not have a constitutional right to a trial presented by a prosecutor with no history of misconduct.  Due process, as explained above, simply requires that the trial he received be fair.  As discussed above, the conduct of the prosecutor *in petitioner's trial* did not deprive petitioner of due process. Accordingly, this claim fails.

### 5.   Cumulative Error

Petitioner claims the foregoing alleged errors, when considered cumulatively, violated his constitutional right to a fair trial.  Petitioner has cited no Supreme Court decision, and the Court is aware of none, recognizing cumulative prejudice as an independent constitutional violation.  In the absence of "clearly established federal law, as determined by the Supreme Court of the United States," habeas relief is not available under § 2254(d)(1).  See Williams v. Taylor, 120 S. Ct. at 1523 (finding, under § 2254(d)(1), federal habeas claims must be based on Supreme Court authority, not decisions of lower federal courts).  Moreover, as discussed above, the only improper conduct established by petitioner was the prosecutor's misstatement of the evidence regarding petitioner's possession of $1700 and the prosecutor's comment on the trial judge's options, made in response to petitioner's testimony that he was subject to a three-strikes sentence.  Any such errors, whether considered separately or cumulatively, did not serve to prejudice petitioner.  Accordingly, petitioner's claim of cumulative error fails.

### 6.   Sentence

### a.   Cruel and unusual punishment

Petitioner claims his sentence of 92 years to life violates his Eighth Amendment right to be free from cruel and unusual punishment. In Lockyer v. Andrade, 538 U.S. 63 (2003), the Supreme Court rejected the contention that Supreme Court case law in this area was of sufficient clarity to constitute "clearly established" federal law within the meaning of 28 U.S.C. § 2254(d), with the exception of "one governing legal principle," specifically: "A

21

United States District Court

For the Northern District of California

1    gross disproportionality principle is applicable to sentences for terms of years." <u>See</u> <u>id.</u> at  72.

2    The Supreme Court further noted that the precise contours of that principle are "unclear" and

3    "applicable only in the 'exceedingly rare' and 'extreme' case."  <u>See</u> <u>id.</u> at 73 (citation omitted).

4           In <u>Andrade</u>, the petitioner was accused of stealing a total of $153 worth of videotapes

5    from two different stores.  <u>See</u> <u>id.</u> at 66.  The jury found the petitioner guilty of two counts of

6    petty theft with a prior conviction and further found the petitioner had suffered three prior

7    felony convictions that qualified under California's "three strikes" law, specifically, three

8    counts of first degree residential burglary.  <u>See</u> <u>id.</u> at 68.  The Supreme Court, observing that

9    "[t]he gross disproportionality principle reserves a constitutional violation for only the

10   extraordinary case," held the California Court of Appeal's affirmance of the petitioner's

11   sentence of two consecutive terms of 25 years to life was not an unreasonable application of

12   clearly established federal law.  <u>See</u> <u>id.</u> at 77.

13          In <u>Ewing v. California</u>, 538 U.S. 11 (2003), the petitioner was accused of stealing three

14   golf clubs, priced at $399 each; he was convicted of one count of felony grand theft, and

15   allegations that he had been convicted previously of four felonies qualifying under California's

16   three strikes law, specifically, one robbery and three burglaries, were found true.  <u>See</u> <u>id.</u> at 18-

17   19.  The Supreme Court affirmed the California Court of Appeal's holding that a sentence of

18   25 years to life under such circumstances was not grossly disproportionate and thus did not

19   constitute cruel and unusual punishment under the Eighth Amendment.  538 U.S. 11, 30-31

20   (2003).  Looking beyond the petitioner's most recent offense, Justice O'Connor's plurality

21   opinion observed:

22                  When the California Legislature enacted the three strikes law, it made a
             judgment that protecting the public safety requires incapacitating criminals who have
23           already been convicted of at least one serious or violent crime.  Nothing in the Eighth
             Amendment prohibits California from making that choice.  To the contrary, our cases
24           establish that "States have a valid interest in deterring and segregating habitual
             criminals". [citations omitted]
25
     <u>Id.</u> at 25.
26

27          In light of the reasoning set forth in <u>Ewing</u> and <u>Andrade</u>, petitioner's sentence of 92

28   years to life is not grossly disproportionate to the crimes for which he stands convicted.  The

22

United States District Court

For the Northern District of California

1   sentences in both Ewing and Andrade were life sentences like petitioner's, although

2   petitioner's sentence, in effect, is harsher, in that he will not become eligible for parole during

3   his lifetime.  Petitioner's crimes, however, were considerably more serious than those in

4   Ewing and Andrade.  Petitioner committed three robberies and one false imprisonment, in each

5   of which he lead people to believe he had a gun and that he would use it against them if they

6   failed to comply with his demands.  Moreover, as noted, a court may properly consider a

7   petitioner's criminal history in determining the proportionality of a sentence under the Eighth

8   Amendment.  See, e.g., Ewing, 538 U.S. at 29 ("[W]e must place on the scales not only [the

9   petitioner's] current felony, but also his long history of felony recidivism.").  Petitioner's

10  criminal history is significantly more serious than that of the petitioner in Ewing and Andrade.

11  Petitioner had sustained 29 prior convictions, including seven that were counted as felony

12  "strike" convictions, specifically, convictions for first degree burglary, five robberies, and one

13  attempted robbery.  These prior convictions included a string of robberies that involved

14  violence or the threat of violence.  Petitioner's propensity to reoffend is apparent as well from

15  the fact that he committed the current crimes only one month after his release from prison, and

16  while he was on parole.

17      Petitioner's circumstances are readily distinguishable from those presented in Ramirez

18  v. Castro, 365 F.3d 755 (9th Cir. 2004), in which the Ninth Circuit Court of Appeals held a

19  sentence of 26 years to life for one count of petty theft was grossly disproportionate.  See id.

20  at 768.  There, the petitioner's prior criminal history "[was] comprised solely of two 1991

21  convictions for second-degree robbery obtained through a guilty plea, for which his total

22  sentence was one year in county jail and three years of probation," and the prior offenses were

23  "more accurately described as 'confrontation petty theft.'"  Id.  As noted, petitioner here had a

24  much more serious and extensive criminal history -- seven strikes and 22 other prior

25  convictions.  His strike convictions involved violence or the threat of such, and led to terms in

26  state prison.  Unlike the petitioner in Ramirez, petitioner does not present the "extremely rare

27  case that gives rise to an inference of disproportionality."  See id. at 770.

28      In sum, the California Court of Appeal's determination that petitioner's sentence was

23

1    not grossly disproportionate to his crime was not an unreasonable application of or contrary to

2    clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1).  Accordingly,

3    petitioner is not entitled to habeas relief on this claim.

                                b.    Ex Post Facto

5          Petitioner claims his sentence violates his rights under the Ex Post Facto Clause

6    because his sentence is based in part on prior convictions.  Such challenges to recidivist

7    sentencing statutes that enhance sentences based on convictions occurring prior to enactment

8    of the statute have been dismissed as meritless.  See United States v. Kaluna, 192 F.3d 1188,

9    1193 (9th Cir. 1999) (en banc) (finding federal three strikes law does not violate Ex Post

10   Facto Clause); Jackson v. Nelson, 435 F.2d 553, 553 (9th Cir. 1971) (finding California

11   recidivist sentencing scheme did not violate Ex Post Facto Clause).  Accordingly, petitioner's

12   challenge to his sentence on this ground fails.

                                c.    Prior plea agreements

14         Petitioner claims the plea agreements he made with respect to his prior convictions did

15   not provide for the use of those convictions to enhance petitioner's sentence on a subsequent

16   offense if petitioner were convicted of such new offense in the future.  Consequently, he

17   argues, the trial court violated those plea agreements by enhancing his current sentence based

18   on the prior convictions.  This argument is meritless.  Although a prosecutor's breach of a plea

19   agreement may violate a defendant's right to due process, see Johnson v. Lumpkin, 769 F.2d

20   630, 633 (9th Cir. 1985); see also Santobello v. New York, 404 U.S. 257, 262 (1971), the trial

21   court was not a party to petitioner's prior plea agreements, and, consequently, was not bound by

22   those agreements.  See, e.g., Johnson, 769 F.3d at 633 (holding breach of plea agreement only

23   occurs only if committed by party with authority to make promise; finding state authorities

24   were not bound by promises made by federal prosecutor in plea agreement).[21]  In any event,

25   petitioner cites to no provision in the plea agreements to the effect that the convictions could

26

27         [21]Nor did petitioner have a constitutional right to be warned, when he entered his pleas, that the
     resulting convictions could be used to enhance a future sentence, as such enhancement is a "collateral
28   consequence" of a guilty plea.  See United States v. Garrett, 680 F.2d 64, 65-66 (9th Cir. 1982).

24

**United States District Court**
For the Northern District of California

1  not be used for purposes of future enhancement.  Accordingly, the trial court's enhancement of

2  petitioner's sentence in the instant case did not violate the plea agreements petitioner made

3  with respect to his prior convictions.

4        7.    <u>Unfair trial</u>

5        Petitioner claims the trial court denied him the fair trial guaranteed by the Due Process

6  Clause, by committing the following trial errors: (a) admitting evidence of petitioner's prior

7  burglary conviction, use of drugs and parole status; (b) limiting the cross-examination of a

8  prosecution witness; (c) admitting cumulative prosecution evidence; (d) denying his motion for

9  mistrial; (e) leaving the courtroom during the readback of testimony; and (f) improperly

10  questioning witnesses.  The Court addresses each of these contentions in turn.

11        a.    <u>Prior conviction, use of drugs, parole status</u>

12        The admission of evidence of petitioner's prior conviction for burglary, of his drug use,

13  and of his parole status did not constitute a due process violation.  As noted earlier, only if

14  there are no permissible inferences that the jury may draw from the evidence can its admission

15  violate the right to due process.  <u>See</u> <u>Jammal v. Van de Kamp</u>, 926 F.2d at 920.  Here,

16  petitioner's burglary conviction was admitted to impeach his credibility as a witness;

17  consequently, there was a permissible inference the jury was entitled to draw from the

18  evidence.  In addition, the jury was instructed that the evidence could only be considered for

19  impeachment, and not for any other purpose, an admonition the jury is presumed to have

20  followed.  <u>See</u> <u>Aguilar v. Alexander</u>, 125 F.3d 815, 820 (9th Cir. 1997) (holding juries are

21  presumed to adhere to instruction limiting use of evidence).  The evidence of petitioner's drug

22  use and parole status likewise was relevant to the jury's evaluation of petitioner's testimony.

23  Petitioner testified on direct examination that he was innocent of the crimes, all of which

24  occurred shortly after his release from prison, because he had gotten his life in order while in

25  prison.  In that regard, he also testified that he had come close to obtaining employment but

26  that his parole status had prevented him from being hired.  On cross-examination, the

27  prosecutor questioned petitioner about his drug usage following his release from prison, and

28

25

United States District Court

For the Northern District of California

1   about petitioner's having violated his parole,[22] in order to contradict petitioner's direct

2   testimony that he had gotten his life back together.  From the evidence of petitioner's

3   substance abuse and parole violation, the jury was entitled to draw the inference that petitioner

4   had neither put his life back in order nor given up committing crimes.  Consequently, the

5   admission of evidence as to petitioner's burglary conviction, his drug addiction and his parole

6   status did not violate his right to due process.

7                    b.    <u>Cross-examination of witness</u>

8        Petitioner claims the trial court improperly prevented defense counsel from

9   questioning Plageman about the identity of one of the other individuals depicted in the

10  photographic lineup.  In order to show the photographic lineup was unfairly suggestive, defense

11  counsel attempted to elicit from Plageman the fact that one of the other five individuals in the

12  photographic lineup was a deputy sheriff.  The trial court's ruling precluding such inquiry was

13  not unfair because the identity of the other individuals was not relevant to the jury's

14  determination of whether the lineup was unduly suggestive.  The trial court permitted defense

15  counsel to question the witness about the appearance of the other people in the lineup,

16  including the fact that the individual in question was wearing a beige, collared shirt with a

17  military appearance, and the six photographs used in the photographic lineup were admitted

18  into evidence and available for viewing by the jury.  Thus, the jury was able to fully assess the

19  reliability and suggestiveness of the lineup based on the appearance of the other individuals in

20  the photographs without the necessity of knowing the identities of the individuals depicted.

21                   c.    <u>Cumulative evidence</u>

22       Petitioner claims the trial court improperly admitted evidence of 911 calls, in which the

23  witnesses described the robber.  The trial court admitted the tapes under California Evidence

24  Code § 1238 as a prior statement of identification.  Petitioner argues that the tapes were

25  cumulative of the witnesses' identifications made at the lineups and in court.  A critical issue in

26  this case was the reliability of the eyewitnesses' identifications of petitioner as the robber.

27  _____

28       [22]Petitioner had failed a drug test after he was released from prison and had failed to report to his parole officer as required.

The jury was entitled to draw inferences as to the reliability of those identifications from the descriptions given to the police shortly after the robberies occurred.  The admission of this evidence did not violate petitioner's right to due process.[23]

            d.    <u>Motion for mistrial</u>

Petitioner claims the trial court improperly denied his motion for a mistrial, which raised the claim that the prosecutor committed misconduct with respect to Melissa Colen's location, as set forth above.  For the reasons discussed above, this claim lacks merit.  As a result, the denial of the motion for a mistrial did not render the trial fundamentally unfair.

            e.    <u>Readback of testimony</u>

Petitioner claims that the trial judge's absence during readback of testimony to the jury during deliberations rendered the trial fundamentally unfair.  After the jury requested that certain portions of the testimony be read to them, the trial judge, in the presence of the attorneys for both parties and the defendant, instructed the reporter as to which portions to read.[24]  The trial judge told the jury that he would be absent, but available, while the reporter read back the testimony to them in the presence of the attorneys and the defendant.  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") Supreme Court precedent is required to support a federal habeas claim.  <u>See</u> 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  Petitioner has cited no instance in which the Supreme Court has recognized that a defendant has a constitutional right to the judge's presence during readback of testimony to the jury.  In <u>La Crosse v. Kernan</u>, 244 F.3d 702, 707-08 (9th Cir. 2001), the Ninth Circuit found that because the Supreme Court has never addressed whether readback of testimony to a jury is a critical stage of the trial triggering a criminal defendant's

---

[23]Petitioner does not claim the admission of the tapes violated his rights under the Sixth Amendment's Confrontation Clause.  Such a claim would be unsuccessful in any event, as all of the witnesses were available for cross-examination as to the statements contained therein.  <u>See</u> <u>Crawford v. Washington</u>, 541 U.S. 36, 59 n.9 (2004) ("Finally we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.")

[24]Additionally, the trial judge overruled defense counsel's objection that the scope of the authorized reading went beyond that which the jury had requested.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

fundamental right to be present, it cannot be said that a state court's rejection of such a claim "was contrary to or an unreasonable application of clearly established Federal law" under AEDPA.  See id.  By analogy, because the Supreme Court has not addressed whether a trial judge's absence during readback violates a defendant's constitutional rights, it cannot be said that the state court's rejection of this claim violated "clearly established Federal law" under AEDPA.

Moreover, the Ninth Circuit views the necessity of a judge's presence during readback to be dependent on the facts of the particular case.  See United States v. Arnold, 238 F.3d 1153, 1155 (9th Cir. 2001); see also id. at 1155, n. 8 (finding split of authority on necessity of judge's presence during readback).  In Riley v. Deeds, 56 F.3d 1117, 1122 (9th Cir. 1995), the Ninth Circuit found error where the trial judge was not simply absent during readback, but in addition had not ruled on the jury's request or exercised any discretion as to what testimony could be read.  Id.  The instant case is readily distinguishable as the trial judge ruled on the jury's request, identified the portions of the testimony that could be read, and, though absent, remained available should any issues arise.  See Arnold, 238 F.3d at 1155 (recognizing distinction "'between the judge's necessary presence while functional proceedings are in progress, and a presence serving only to satisfy symbolic ritual, such as the judge's presence in the courtroom during a readback of testimony'") (quoting United States v. Grant, 52 F.3d 448, 450 (2d Cir. 1995)).  Accordingly, even under Ninth Circuit case law, the trial judge's absence in this case would not constitute error.

f.      Questioning of witnesses

Petitioner claims that the trial judge improperly questioned witnesses.  In general, it is appropriate for a trial judge to take part in examining witnesses in order to clarify testimony and other evidence, control the orderly presentation of the evidence, and prevent undue repetition.  United States v. Morgan, 376 F.3d 1002, 1008 (9th Cir. 2004); United States v. Laurins, 857 F.2d 529, 537 (9th Cir. 1988).  A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when the record discloses actual bias or leaves the reviewing court with an abiding impression that the judge's remarks and questioning

28

projected to the jury an appearance of advocacy or partiality.  See United States v. Parker, 241

F.3d 1114, 1119 (9th Cir. 2001).  Here, petitioner has failed to identify any questioning that

conveyed partiality or advocacy by the trial judge.  Rather, petitioner cites to several instances

in which the trial judge interposed a limited number of questions.  These questions concerned

the distance from the front door of the restaurant to the back, the location of the bakery,

whether a witness had been touched by the robber, whether a witness who could not provide a

sketch was an artist, and the length and appearance of the robber's hair.  In each instance, the

judge asked, at most, a few questions, and the questions concerned matters about which the

witnesses had just testified.  The relatively brief questioning by the trial judge in this case was

done for the purpose of clarifying the witnesses' testimony, and did not render the trial

fundamentally unfair.

        In sum, the trial court did not violate petitioner's due process right to a fair trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.

        8.      Judicial Bias

        Petitioner claims that the above-discussed rulings by the trial judge demonstrate that the

trial judge was biased against him.  The Due Process Clause guarantees a criminal defendant

the right to a fair and impartial judge.  See In re Murchison, 349 U.S. 133, 136 (1955);

Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 709 (9th Cir. 1989).  Judicial rulings

alone do not constitute a valid basis for demonstrating judicial bias or partiality, however.

Liteky v. United States, 510 U.S. 540, 551 (1994).  As petitioner provides no evidence of

judicial bias other than the trial judge's rulings, the claim of bias fails.

        9.      Ineffective Assistance of Appellate Counsel

        Petitioner claims he was deprived of due process on the ground that his appellate

counsel provided ineffective assistance by failing to present additional claims on appeal.  Due

process requires that appellate counsel provide effective assistance to an indigent client.

Evitts v. Lucey, 469 U.S. 353, 355-56 (1985).  Claims of ineffective assistance of appellate

counsel are analyzed according to the standard of Strickland v. Washington, 466 U.S. 668, 686

(1984), namely, that counsel's performance fell below an objective standard of reasonableness

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

and that there is a reasonable probability that, but for counsel's performance, the outcome on

appeal would have been different.  Miller v. Keeney, 882 F.2d 1428, 1433-34 (9th Cir. 1989).

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

requested by a defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Gerlaugh v. Stewart,

129 F.3d 1027, 1045 (9th Cir. 1997).  "The weeding out of weaker issues is widely recognized

as one of the hallmarks of effective appellate advocacy."  Miller, 882 F.2d at 1434.

Consequently, appellate counsel frequently will both remain above an objective standard of

competence and have caused his client no prejudice, for the same reason--because he declined

to raise a weak issue.  Id.

Here, appellate counsel presented six of the above-discussed claims, namely, that the

four robbery charges should have been severed for trial, that evidence of petitioner's prior

robberies was improperly admitted, that the lineup identifications were improperly suggestive,

that the prosecutor engaged in misconduct by referring to a fact not in evidence, that there was

cumulative error, and that petitioner's sentence was unconstitutional.  Petitioner complains

that appellate counsel failed to raise the other claims discussed in this order.  Any such failure

was neither objectively unreasonable nor prejudicial, however, because, for the reasons

discussed above, the other claims are without merit.  Accordingly, petitioner's claim of

ineffective assistance of appellate counsel fails.

### CONCLUSION

In light of the foregoing, the petition for a writ of habeas corpus is DENIED.

The Clerk shall close the file and terminate any pending motions.

IT IS SO ORDERED.

DATED: December 29, 2005

MAXINE M. CHESNEY
United States District Judge